## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE POLICE RETIREMENT SYSTEM OF ST. LOUIS, on Behalf of Itself and All Others Similarly Situated,<br><br>*Plaintiff*<br><br>vs.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LIMITED, CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIBANK N.A., CRÈDIT AGRICOLE CORPORATE AND INVESTMENT BANK,  CRÈDIT AGRICOLE S.A., CRÈDIT AGRICOLE SECURITIES (USA) INC., CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., NOMURA HOLDINGS INC., NOMURA SECURITIES INTERNATIONAL, INC., HIREN GUDKA, AMANDEEP SINGH MANKU, SHAILEN PAU and BHARDEEP SINGH HEER and JOHN DOES NO. 1-100.<br>*Defendants.* | No. 1:17-cv-298<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

**Page(s)**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 3

PARTIES ........................................................................................................................... 4

FACTUAL ALLEGATIONS .......................................................................................... 11

    A.  SSA Bond Market ............................................................................................ 11

    B.  Defendants Unlawful Conduct ........................................................................ 14

    C.  Defendants Manipulation of SSA bonds is Consistent with their Manipulation of Other Financial Benchmarks ................................................................................. 15

    D.  Economic Analysis Confirms That the SSA bond Market Was Manipulated ................... 19

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ......................... 21

CLASS ACTION ALLEGATIONS ............................................................................... 23

CAUSES OF ACTION ................................................................................................... 26

PRAYER FOR RELIEF ................................................................................................. 27

JURY DEMAND ............................................................................................................ 28

i

Plaintiff The Police Retirement System of St. Louis (the "System") on behalf of itself and all others similarly situated, ("Plaintiff") complains upon knowledge as to themselves and their acts and upon information and belief as to all other matters against Defendants (defined in ¶¶ 16-48) for their violations of law from at least January 1, 2010 through November 2014 ("Class Period").

## NATURE OF THE ACTION

1.      Defendants are a group of the largest dealers in the secondary market of supranational, sub-sovereign, and agency bonds ("SSA bonds") denominated in various currencies. SSA bonds are issued by international entities, regional development banks, infrastructure borrowers, social security funds, export creditors, and rail sector entities. These international issuers occasionally issue their debt in currencies different from their local currency. The issuers would occasionally issue their bonds in U.S. Dollars to take advantage of lower funding costs, and to increase the possible number of investors that would buy their bonds. Defendants colluded to fix the prices of SSA bonds sold to and purchased from investors in the secondary market.

2.      Institutional investors participate in the secondary market for SSA bonds. These investors purchase SSA bonds because the bonds are perceived as secure investments with a low risk of default. The SSA bond market has grown considerably over the past decade and is valued at over $9 trillion.

3.      The Bank Defendants (defined in ¶ 42) as some of the world's largest dealers of SSA bonds, compete for customers in the secondary market. The Bank Defendants are supposed to compete for customers based on the prices they offer for the purchase and sale of SSA bonds.

4.      SSA bonds are priced by Defendants. Dealers quote bond prices to investors with a bid price and an ask price. The bid price is the price that the dealer is willing to buy the bond and the ask price is the price that the dealer is willing to sell the bond. The difference between the bid price and the ask price is called the spread. Normally, a smaller spread is indicative of competitive pricing. Both of these prices, and the spread, are quoted in basis points. A basis point is $1/100^{th}$ of one percent.

5.      SSA bond issuers preferred to use underwriters with a demonstrated ability to provide liquidity in the secondary market. Defendants could demonstrate liquidity in the secondary market by trading large volumes of that issuer's bonds.

6.      Defendants, instead of competing with each other, fixed the prices at which they bought and sold SSA bonds in the secondary market. From at least as early as January 1, 2010, Defendants colluded with each other to artificially widen the bid-ask spreads they quoted to their customers. As a result of Defendants' conspiracy, investors paid significantly more to purchase SSA bonds and received significantly less when they sold SSA bonds.

7.      Regulators from the United States and Europe have begun investigating Defendants due to their conduct in the SSA bond market. The United States Department of Justice ("DOJ") commenced an investigation into Defendants' practices in the SSA bond market and is currently reviewing transcripts of chatrooms used by SSA bond traders employed by Defendants. The European Commission ("EC") opened a preliminary investigation into the anticompetitive conduct within the SSA bond market. The U.K Financial Conduct Authority ("FCA"), in addition to launching its own preliminary investigation, is currently coordinating its investigation with the DOJ.

8.       Following the announcement of these investigations the Defendants terminated or suspended at least four SSA bond traders: Defendants Gudka, Manku, Pau, and Heer.

9.       Defendants' anticompetitive conduct has caused, and continues to cause, substantial injury to SSA bond investors in the secondary market. Defendants have inflated the prices at which they sold SSA bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiff and members of the Class. Thousands of U.S.-based investors have purchased and sold billions of dollars' worth of SSA bonds directly from Defendants. Plaintiff, on behalf of itself and all others similarly situated, seeks damages arising from Defendants' misconduct, trebled as provided by law, and injunctive relief, enjoining the continuation of the alleged misconduct.

## JURISDICTION AND VENUE

10.       This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.       Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391 (b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.       This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.

13.     Additionally, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct. Defendants' SSA bond traders dealt directly with U.S. –based investors, buying and selling SSA bonds from them in a continuous flow of interstate and foreign commerce. Accordingly, Defendants anticompetitive conduct had direct, substantial and reasonably foreseeable effects on U.S. commerce.

14.     The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

## PARTIES

### A.     Plaintiff

15.     The Police Retirement System of St. Louis is a public pension fund that helps to ensure the financial security of its police officer members and their families since 1957. The System manages assets in excess of $600 million. During the Class Period the System purchased SSA bonds and was injured due to Defendants violations of law. The System maintains offices at 2020 Market Street, St. Louis Missouri 63103.

### B.     Defendants

#### a.  Bank of America

16.     Defendant Bank of America Corporation is a Delaware corporation headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of America Corporation is the parent company of Defendants Bank of America N.A., Bank of America Merrill Lynch International and Merrill Lynch, Pierce, Fenner, & Smith, Inc.

17.     Defendant Bank of America N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina and is an indirect wholly owned subsidiary of Bank of America Corporation.

18.     Defendant Bank of America Merrill Lynch International Limited is a subsidiary of Bank of America, N.A. with its principal place of business located at 2 King Edward Street, London EC1A 1 HQ England.

19.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business at One Bryant Park, New York, New York 10036 and is an indirect wholly owned subsidiary of Bank of America Corporation.

20.     Collectively, Defendants Bank of America Corporation, Bank of America N.A., Bank of America Merrill Lynch International Limited, and Merrill Lynch Pierce Fenner & Smith are referred to as "Bank of America." Bank of America purchased and sold SSA bonds to members of the Class. During the Class Period, Bank of America employed Defendants Amandeep Singh Manku and Hiren Gudka, both of whom are SSA bond traders under investigation by the DOJ.

### b. Citi

21.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business at 388 Greenwich Street, New York, New York 10013. Through control of its wholly owned and/or controlled subsidiaries including those Defendants identified below, that comprise its Institutional Clients Group Business segment, Citigroup participated in the SSA bond primary and secondary markets, including in the United States.

22.     Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business at 701 East 60th Street North, Sioux Falls, South Dakota 57104.

23.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its principal place of business at 388 Greenwich Street, New York, New York 10013. CGMI is an indirect, wholly owned subsidiary of Defendant Citigroup. CGMI is Defendant Citigroup's primary broker-dealer in the United States. CGMI provides underwriting and trading services across such asset classes as equities, corporate, government, and agency bonds.

24.     Defendant Citigroup Global Markets Limited ("CGML") is a U.K.-registered private limited company with its principal place of business at Citigroup Centre, 33 Canada Square, London E14 5LB, United Kingdom. CGML is an indirect, wholly owned subsidiary of Defendant Citigroup. Operating globally, including in the Americas CGML is Defendant Citigroup's international broker-dealer. Defendant CGML has a major presence in international financial markets as a dealer market maker in equity and fixed income securities. CGML's major counterparties include investment managers, insurers, and hedge funds. In the United Kingdom, CGML is authorized by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

25.     Defendants Citigroup, Citibank, CGMI and CGML are collectively referred to as "Citi" in this Complaint. During the Class Period, Citi purchased and sold USD-denominated SSA bonds directly from and to the Class in the United States including in this District, at anticompetitive prices.

   **c.   Crèdit Agricole**

26.     Defendant Crèdit Agricole S.A. is a French *societe anonyme* with its principal place of business in Montrouge, France.

27.     Defendant Crèdit Agricole Corporate and Investment Bank is a banking entity headquartered at 9, quai du President Paul Doumer, La Defense Cedex, 92920 Paris, France. Defendant Crèdit Agricole Corporate and Investment Bank is a wholly owned subsidiary of Crèdit Agricole S.A. and is a bank organized under the laws of France with branch locations in New York, New York.

28.     Defendant Crèdit Agricole Securities (USA) Inc. is a New York Corporation headquartered in the Crèdit Agricole Building, 1301 Avenue of the Americas, New York New York. Crèdit Agricole Securities (USA) Inc. is wholly owned by Crèdit Agricole S.A.

29.     Defendants Crèdit Agricole S.A., Crèdit Agricole Corporate and Investment Bank, Crèdit Agricole Securities (USA) Inc., and their subsidiaries and affiliates are collectively referred to as "Crèdit Agricole." During the Class Period, Crèdit Agricole purchased SSA bonds directly from and sold SSA bonds directly to members of the Class in the United States. Crèdit Agricole employed Defendants Amandeep Singh Manku and Shailen Pau, who are both under investigation by the DOJ.

### d. Credit Suisse

30.     Defendant Credit Suisse Group AG is a Swiss *Aktiengesellschaft* with its principal place of business in Zurich, Switzerland.

31.     Defendant Credit Suisse AG is a Swiss *Aktiengesellschaft* with its principal place of business in Zurich, Switzerland.

32.     Defendant Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG and Credit Suisse AG is a bank organized and existing under the laws of Switzerland. Credit

Suisse AG maintains a New York, New York branch and is registered with and licensed by the New York Department of Financial Services.

33.    Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse Group AG.

34.    Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, their subsidiaries and affiliates are collectively referred to as "Credit Suisse." During the Class Period Credit Suisse purchased SSA bonds directly from and sold SSA bonds directly to members of the Class in the United States and in this District at prices that were the product of collusion. During the Class Period, Defendant Credit Suisse employed Defendant Shailen Pau, a SSA bond trader who is under investigation by the DOJ.

### e.  Deutsche Bank

35.    Defendant Deutsche Bank AG is a German *Aktiengesellschaft* with its principal place of business in Frankfurt, Germany. Deutsche Bank AG is registered with and licensed by the New York Department of Financial Services with a registered address in New York, New York.

36.    Defendant Deutsche Bank Securities, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Deutsche Bank Securities Inc. is an indirect wholly owned subsidiary of Deutsche Bank AG.

37.    Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates are referenced collectively as "Deutsche Bank." During the Class Period Deutsche Bank purchased SSA bonds directly from and sold SSA bonds directly to

members of the Class in the United States and in this District at prices that were the product of collusion. During the Class Period, Deutsche Bank employed Defendant Hiren Gudka, a SSA bond trader who is under investigation by the DOJ.

### f. Nomura

38.    Defendant Nomura Holdings, Inc. is a Japanese corporation with its principal place of business at 1-9-1 Nihonbashi, Chuo-Ku, Tokyo, Japan 103-8645. It is the ultimate parent of Nomura.

39.    Defendant Nomura Securities International, Inc. is a New York corporation with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019. Nomura Securities International, Inc. is wholly owned by Nomura Holdings, Inc.

40.    Defendants Nomura Holdings, and Nomura Securities International, Inc., their subsidiaries and affiliates are collectively referred to as "Nomura." During the Class Period, Nomura purchased SSA bonds directly from and sold SSA bonds directly to members of the Class in the United States and in this District at prices that were the product of collusion. During the Class Period, Nomura employed Defendant Bhardeep Singh Heer, a SSA bond trader under investigation by the DOJ.

41.    Collectively, Defendants Bank of America, Citi, Crèdit Agricole, Credit Suisse, Deutsche Bank, and Nomura are referred to as the "Bank Defendants."

### g. Hiren Gudka

42.    Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, England. During the Class Period, Gudka purchased SSA bonds from and sold SSA bonds to members of the Class.  During the Class Period, Gudka was employed by Defendants Bank of America and Deutsche Bank.

### h. Amandeep Singh Manku

43.    Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex, England. During the Class Period, Manku traded SSA bonds and was employed Defendants Bank of America and Crèdit Agricole.

### i. Shailen Pau

44.    Defendant Shailen Pau ("Pau") is an individual residing in London, England. During the Class Period, Pau traded SSA bonds and was employed by Defendants Credit Suisse and Crèdit Agricole.

### j. Bhardeep Singh Heer

45.    Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex, England. During the Class Period, Heer traded SSA bonds and was employed by Defendant Nomura.

46.    Collectively, Defendants Heer, Pau, Manku, and Gudka are referred to as the "Trader Defendants."

### k. John Doe Defendants

47.    John Doe Defendants No. 1-100 are other entities or persons, including banks, brokers, their parents, subsidiaries, affiliates, current or former employees, and co-conspirators whose identities are currently unknown to Plaintiff. The John Doe Defendants participated in, furthered, and/or combined, conspired, aided and abetted, or agreed with others to perform the unlawful agreements and acts alleged herein.

48.    Collectively, the John Doe Defendants, Bank Defendants and the Trader Defendants are referred to as "Defendants."

## FACTUAL ALLEGATIONS

A.    **SSA Bond Market**

49.    The supranational, sub-sovereign, and agency ("SSA") sector occupies a significant segment of the broader bond market. SSA encompasses a highly diverse array of international issuers.

50.    Supranational borrowers are institutions whose mandate extends across national borders. These borrowers are typically governed or owned by representatives from a number of countries created to further the economic and social development policy goals of the governments or shareholders.

51.    Supranational issuers are diverse in terms of size, geographic reach, and orientation. They can be global, continental or regional in their focus and implement their objectives by extending loans to sovereigns, the private sector and/or taking equity investments. Supranational issuers essentially operate as commercial enterprises whilst ultimately providing a platform for international, regional or domestic public policy.

52.    Most supranational issuers are chartered by international law and do not hold national banking licenses and are generally not supervised or regulated by national authorities.

53.    Sub-sovereign borrowers are the next level beneath a sovereign issuer. They are state-level issuers as opposed to federal government issuers. For example, bonds issued by the province of Ontario, a Canadian province, would be considered sub-sovereign debt.

54.    The agency sector of the SSA market is debt issued by any institution that performs a task on behalf of its governing sovereign or sovereign linked state. For example, Fannie Mae, and Freddy Mac, are considered agencies.

55.    SSAs are some of the most active borrowers in the bond markets. SSAs are also among the largest end users of cross currency swaps and seek out arbitrage opportunities to reduce the cost of funding.

56.    One method employed by SSAs to reduce their cost of funding and widen the appeal of their bonds is to issue their bonds in U.S. Dollars. There are a variety of incentives for SSAs to issue their bonds in U.S. Dollars.

   a.  First, SSA bond issuers may seek to take advantage of lower borrowing costs.

   b.  Second, issuers can benefit from diversifying their investor-base by including U.S. investors.

   c.  Finally, the U.S. Dollar's stability prevents issuers from risking significant devaluation of their bonds based on currency volatility.

57.    To issue SSA bonds the issuer must appoint a lead or managing underwriter. The appointment of the aforementioned underwriter is intended to be a competitive process among banks, with each bank submitting bids to SSA bond issuers for underwriting services. Generally, bonds are underwritten by a group of banks called a "syndicate." Banks within the syndicate take on a variable amount of responsibility in the bond issue.

58.    A crucial factor weighed in an issuers selection of an underwriter is the bidding bank's ability to provide liquidity in the secondary market. Issuers typically favor banks that provide liquidity for their debt issuance in the secondary market.

59.    Banks profit in many ways if they are selected to perform the underwriting services. Two of the sources of an underwriting banks profit are: (1) a fee charged for the banks services underwriting the issuance, and (2) profits from the sale of the SSA bond issuer's bonds.

60.     There are three key terms regarding the pricing of SSA bonds. The par value is the bonds face value, payable on the bond's maturity date. The maturity date is the date at which par value of the bond is paid. The bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid over a defined period of time until the bond reaches its maturity date.

61.     After the SSA bonds are issued in the primary market the bonds are then traded in the secondary market among bond dealers and investors, including pension funds, hedge funds, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments.

62.     Trading in the secondary market is done over-the-counter ("OTC"). An OTC market requires the parties to either (1) deal directly with the counterparty buying or selling the bond or (2) work through an intermediary broker who then deals directly with the bank or institutional investor to buy or sell the bond. The SSA bond market is valued between $9 trillion and $15 trillion. The size of the market tripled during the Class Period.

63.     The Bank Defendants acted as "market makers" for various SSA bonds. A market maker is a company or an individual that quotes both a bid and an ask price in a financial instrument. In the SSA bond market, the market makers quoted bid and ask prices for SSA bonds.  The difference between the bid price and ask price is referred to as the bid/ask spread or simply the spread. Bid and ask prices are typically quoted in terms of basis points where one basis point equals $1/100^{th}$ of one percent or .0001.

64.     To trade in the secondary market the investor would have to contact one or multiple market makers directly (or through an intermediary broker) and request the bid and ask price for that specific SSA bond. These requests could be carried out telephonically, by

electronic means, and/or in an electronic chat room. Customers would typically contact multiple market makers to determine which market maker had the best price for a specific bond.

65.    Market makers achieve a better profit when they quote wider spreads. Customers conversely want narrower spreads because they are able to sell their SSA bonds for more and/or buy them for less. In a competitive market, Defendants would compete with each other for customers seeking to buy and sell SSA bonds resulting in narrower spreads.

## B.    Defendants' Unlawful Conduct

66.    Defendants and their traders, instead of competing with each other for customers SSA business, engaged in an unlawful scheme to fix the bid-ask spreads for SSA bonds sold to their customers in the secondary market.

67.    The scheme was facilitated by the widespread use of electronic chat rooms to share confidential customer information. These chat rooms, and other electronic tools, allowed traders at multiple banks to collude and manipulate the bid/ask spread of SSA bonds.

68.    Defendants carried out their unlawful conduct by sharing confidential customer information amongst each other. Defendants shared information regarding customer identities, trading habits, trade flow, and order sizes. With this information Defendants coordinated the bid/ask prices they would quote to customers. Defendants' collusion resulted in Plaintiff paying substantially more, and receiving substantially less for SSA bonds traded in the secondary market.

69.    Manipulating the secondary market could substantially increase Defendants' primary market business. One former banker revealed that "Issuers conduct empirical measurement and publish a chart. They use these charts to award business so say, you are bank

14

Z, you will get told by the issuer *where you rank on that chart to incentivize you to do more secondary business*."[1]

70.    The impact on Defendants' secondary market profits was substantial. As one SSA bond trader acknowledged: "if you can speak to *another trader and agree to sell a bond at a certain price and not below, then that makes a big difference*."[2]

71.    Thus, Defendants were able to exploit the demand for SSA bonds by artificially keeping the price of such bonds high. Absent a conspiracy Defendants that maintained such artificially wide spreads would not have been able to compete in a rational marketplace. However, since Defendants here were able to agree on the "floor" or lowest price they'd accept for a given SSA bond, they could maintain their liquidity and continue to profit off both the primary market and the secondary market at Plaintiff's expense.

## C.    **Defendants' Manipulation of SSA bonds is Consistent with their Manipulation of Other Financial Benchmarks**

72.    Defendants have been investigated, charged, and convicted of manipulating some of the largest benchmarks that effect financial instruments valued at over $700 trillion. In conjunction with these investigations Defendants have produced millions of pages of records to government regulators, suspended or removed senior employees, and paid billions of dollars in fines.

### a.   **USD ISDAFIX**

73.    From January 2007 through January 2012, Defendant Citi manipulated the U.S. Dollar International Swaps and Derivatives Association Fix. ("USD ISDAFIX").

---

[1] Abbrinav Ramnarayan & Helene Durand, *EXCLUSIVE-DoJ investigates bond traders over market-rigging*, Int'l Financing Rev. (Jan 6, 2016) http://www.ifre.com/exclusive-doj-investigates-bond-traders-over-marketrigging/%2021230385.fullarticle (emphasis added).

[2] Id.

74.    USD ISDAFIX is a benchmark rate used in the $379 trillion market for interest rate swap marketplace. Regulators in the United States and Europe have been actively investigating the manipulation of this benchmark rate by Defendants.

75.    The CFTC found that Defendant Citi attempted to manipulate USD ISDAFIX by making false submissions as a panel bank to the Swaps Broker. This skewed the rates and spreads in a direction that would benefit Defendant Citi's trading positions. Defendant Citi would further manipulate USD ISDAFIX by bidding, offering, and executing transactions around the fixing window.

76.    Defendant Citi's manipulation of USD ISDAFIX demonstrates the disregard that Citi held for its customers and the integrity of the financial system. The manipulation was so rampant that one Citi customer complained. The customer told a Citi trader:

> **Citibank Customer:** Each person tells me that there is no manipulation by the traders; however, the **coincidence of us losing on everyone but one fixing… is starting to get old**.[3]

(Emphasis added)

77.    Defendant Citi's unlawful conduct involved multiple traders, senior level management employed similar means to manipulate USD ISDAFIX as they used to manipulate SSA bonds. These methods included: (1) coordinating trading positions in electronic chat rooms; (2) using groups of traders to maximize the effect of their manipulation; and (3) using confidential customer order information to manipulate the rate.

78.    As a result of their manipulation of USD ISDAFIX, Citi paid a $250 million fine to the CFTC.[4]

---

[3] Commodity Futures Trading Commission, *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Citibank N.A.*, at 3 (May 25, 2016)

### b. LIBOR

79.    Defendants Deutsche Bank, Citibank, Credit Suisse, and Crèdit Agricole have been fined by regulators in the United States and Europe due to their manipulation of the London Interbank Offered Rate ("LIBOR") and Euro Interbank Offered Rate ("EURIBOR").

80.    The LIBOR investigations have revealed Defendants' anemic compliance programs, and internal controls. For example, Deutsche Bank initiated the BIRG MMD review to examine whether the sudden explosion in profits from the Money Market Desk ("MMD") was a result of manipulation. The investigation was hobbled from its beginning. The types of keywords investigators were allowed to use were limited and often wouldn't capture the kind of manipulation that was rampant within the MMD. Despite significant limitations the internal review turned up 830,000 documents. Most of these documents were in French or languages other than English. Deutsche Bank assigned the review of 830,000 mostly French documents to Mr. Mulcany. Mr. Mulcany, a Deutsche Bank employee, could not speak French and was not given adequate resources to translate the 830,000 documents before the BIRG MMD review issued its conclusions.[5]

81.    Deutsche Bank's interest in pursuing profit at all costs rather than pursuing profit ethically permeated all levels of management. Anshu Jain, the Co-Chief Executive Officer during the Class Period, actively encouraged his employees to exceed risk limits and continue entering into risky, proprietary trades. At the same time, Mr. Jain eviscerated Deutsche Bank's compliance department and substantially weakened their internal controls.

---

[4] Commodity Futures Trading Commission, *CFTC Orders Citibank to Pay $250 Million for Attempted Manipulation and False Reporting of U.S. Dollar ISDAFIX Benchmark Swap Rates*, (May 25, 2016).

[5] Federal Financial Supervisory Authority of Germandy Bundesanstalt Fur Finanzdienstleistungsaufsicht ("BaFin"), Convenience Translation, *Audit report for the IBOR special audit by Ernst & Young*, (May 11, 2015) http://graphics.wsj.com/documents/doc-cloud-embedder/?sidebar=0#2167237-deutsche (last visited Jan. 9, 2017)

82.     Defendant Citi engaged in unlawful conduct with regards to the setting of LIBOR. These practices continued even after Citi was notified that the CFTC was conducting an investigation into its unlawful conduct. Showing a complete disregard for the law, its customers, and the integrity of LIBOR, Citi employees actively exploited their relationships with traders at Defendant Deutsche Bank to manipulate LIBOR and illegally profit.

83.     The European Commission found that both Defendants Citi and Deutsche Bank were members of a Yen Interest Rate Derivatives Cartel.[6] Crèdit Agricole and Deutsche Bank were found to be members of the Euro Interest Rate Derivatives Cartel.[7]

84.     Defendants Citi, Deutsche Bank, Credit Suisse and Crèdit Agricole were found to have participated in several different interest rate cartels by the Swiss Competition Commission (COMCO). These cartels were formed to manipulate interest rates and were required to pay a fine of 100 million Swiss francs.

### c.  The FX Market

85.     Regulators around the world have conducted investigations into the manipulation of the Foreign Exchange ("FX") Market. As a result of these investigation regulators have levied fines from a group of banks including some of the Defendants.

86.     Defendants' traders used electronic chat rooms to coordinate their trading positions with traders at other banks and disclose confidential customer order information and trading positions.

---

[6] European Commission, *AMENDED Antitrust: Commission fines banks € 1.49 billion for participating in cartels in the interest rate derivatives industry*, http://europa.eu/rapid/press-release_IP-13-1208_en.htm (December 4, 2013)

[7] European Commission, *Antitrust: Commission fines Crèdit Agricole, HSBC and JPMorgan Chase €485 million for euro interest rate derivatives cartel*, http://europa.eu/rapid/press-release_IP-16-4304_en.htm (December 7, 2016).

87.     Defendants have been fined as a result of their manipulation of the FX Market. Defendants Bank of America and Citi were forced to pay fines to the Office of the Comptroller of the Currency ("OCC").  Defendant Citi also paid fines to the DOJ, CFTC, and the FCA. [8]

88.     Defendants' manipulation of the FX market employed similar means to their manipulation of SSA bonds. Using similar chat rooms and technologies to communicate customer information and trade in advance of their orders.

**D.      Economic Analysis Confirms That the SSA Bond Market Was Manipulated**

89.     Economic analysis supports the allegations herein that the Defendants manipulated the bid-ask spread of SSA bonds. This analysis examined a sample of the SSA bond offerings from the International Bank for Reconstruction and Development ("IBRD"), the Asian Development Bank ("ASIA"), the Inter-American Development Bank ("IADB"), and Germany's KfW Development Bank ("KFW"). All four of these issuers are AAA-credit-rated SSA issuers.

90.     The below chart shows the four selected SSA bonds' bid-ask spread over a 33 day period during the Class Period. This chart captures the effect of the government's announcement that it was investigating the Forex Market had on the bid-ask spread of SSA bonds. The orange line highlights the date of the announcement.

---

[8] Karen Freifeld, David Henry, and Steve Slater, *Global banks admit guilt in forex probe, fined nearly $6 billion*, REUTERS, http://www.reuters.com/article/us-banks-forex-settlement-idUSKBN0O50CQ20150520 (May 20, 2015)

**Figure 1**



**Comparison Three Different SSA bond's Bid-Ask Spread From Oct-14-2014 through Dec-1-2014**

91.     This chart clearly shows that each of the four sample SSA bonds dropped on the same day. This drop was caused by the government's announcement that it would be investigating the Forex Market.

92.     The below chart shows the difference in average bid-ask spreads from 2010 through 2012 and from 2013 through 2014 for the group of SSA bonds . The average bid-ask spread from 2010 to 2012 is ***more than 70% higher*** than the spread from 2013 through 2014 than for the two years prior. The average spread from 2010 through 2012 is represented by the blue bar while the average spread from 2013 to 2014 is represented by the red bar.

**Figure 2**



Difference in Basis Points of Average Bid-Ask
Spread From 2010 Through 2012 and 2013 through
2014

93.    The above charts demonstrate that the bid price and the ask price of SSA bonds were manipulated throughout the Class Period.

94.    This data shows that SSA bond spreads dropped significantly on November 12, 2014, when the first FX settlements were announced, suggesting the Defendants abandoned their price-fixing and bid rigging scheme around this time. *See* Figure 1 & 2 *supra*.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

95.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their conspiracy from Plaintiff and members of the Class.

96.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to artificially inflate bid-ask spreads to the benefit of Defendants and to the detriment of Plaintiff and members of the Class, and they further conspired to keep their collusive and manipulative conduct secret. As a result, Plaintiff and the Class did not discover and could not have discovered through the exercise of reasonable due diligence that they were

injured by Defendants' conspiracy until at the earliest December 9, 2015, when the DOJ investigation became public.

97.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of their conspiracy. These communications occurred in non-public chat rooms, instant messages, and through email, telephone calls, and in-person meetings, none of which are or were reasonably available to Plaintiff or members of the Class.

98.    The chat rooms in question were operated by senior traders within Defendants operations and Defendants strictly limited access to the chat rooms. The substance of the conversations occurring within these chat rooms was unknown to Plaintiff until December 9, 2015, at the earliest. Still, the full contours of Defendants' conspiracy are not public.

99.    Defendants knew that they could not subject their collusive conduct to public scrutiny. Additionally, Defendants actively and jointly concealed their conspiracy. For instance Defendants agreed among themselves not to publicly discuss or otherwise reveal the nature and substance of the acts and communications in furtherance of the conspiracy.

100.    None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this complaint.

101.    Additionally, because SSA trades occur primarily in the private, over-the-counter market, Defendants' trades and trading strategies are not public information. Reasonable due diligence could not have uncovered Defendants conspiracy because the non-exchange-based, closed, and private nature of the trades helped to conceal Defendants' conduct. Throughout the Class Period Plaintiff and members of the Class regularly monitored news reports concerning the

financial industry and the SSA market. Plaintiff and members of the Class undertook such activity in order to try to buy and sell SSA bonds at competitive prices. Nonetheless, Plaintiff and members of the Class did not know of, and could not have known of, Defendants' conspiracy until the *Bloomberg* article published on December 9, 2015.

102.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class have been tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

104.    Plaintiff brings this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as the representatives of a Class defined as follows:

> All persons or entities who, from January 1, 2010, to November 2014, directly entered into SSA bond transactions with Defendants, or their respective subsidiaries or affiliates in the United States or its territories. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities.

105.    Numerosity. Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class, but believes that there are thousands of Class members geographically dispersed throughout the United States.

106.    Typicality. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiff and members of the Class to

pay inflated bond prices when they were buying or receive unduly low bond prices when they were selling.

107.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims Plaintiff will prove other Class members' claims as well.

108.    <u>Adequacy of Representation</u>. Plaintiff is represented by counsel that is experienced and competent in the prosecution of complex class action litigation. Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

109.    <u>Commonality</u>. There are questions of law and fact common to the Class, which relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

   a.    whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain or stabilize SSA bond bid-ask spreads in interstate commerce in the United States;

   b.    the identity of the participants of the conspiracy;

   c.    the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

   d.    whether the alleged conspiracy violated Section 1 of the Sherman Act;

   e.    whether the conduct of Defendants and their co-conspirators, as alleged caused injury to the business and property of Plaintiff and other members of the Class.

  f.  The appropriate measure of damages sustained by Plaintiff and other members of the Class;

  g.  whether Plaintiff and other Class Members are entitled to injunctive relief; and

  h.  the appropriate injunction needed to restore competition.

110. <u>Predominance</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants wrongful conduct.

111. <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

112. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### CLAIM ONE
### VIOLATION OF 15 U.S.C. § 1
### AGREEMENT RESTRAINING TRADE
#### (Against all Defendants)

113.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

114.    Defendants and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices on SSA bonds.

115.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants conspiracy is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

116.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants unreasonable restraint of trade. Any ostensible procompetitive benefit was pre-textual or could have been achieved by less restrictive means.

117.    Defendants' conspiracy and the resulting impact on the prices of SSA bonds occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

118.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiff and each member of the Class have suffered injury to their business or property. Plaintiff and each Class member's damages are directly

26

attributable to Defendants' conduct, which resulted in all Class members paying artificially inflated bid-ask spreads on every SSA bond they purchased or sold during the Class Period.

119.    Plaintiff and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants conduct unlawful.

120.    Plaintiff and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act.

## CLAIM TWO
## UNJUST ENRICHMENT
### (Against all Defendants)

121.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

122.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

123.    Plaintiff and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

124.    WHEREFORE, Plaintiff, on behalf of itself and the proposed Class of similarly situated entities, respectfully request that the Court:

    a.  Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, designate Plaintiff as Class representatives and appoint Plaintiff' counsel as counsel for the Class;

27

b.  Adjudge and decree that Defendants' unlawful conduct alleged herein violates section 1 of the Sherman Act;

c.  Adjudge and decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff and the Class;

d.  Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint;

e.  Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

f.  Award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

g.  Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

h.  Award Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity, from the date of service of the initial Complaint in this action; and

i.  Order such other, further, and general relief as it may deem just and proper

### **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of them self and the proposed Class, demands a trial by jury on all issues so triable.

DATED:     New York, New York
               January 13, 2017

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**

By:  /s/Mitchell M.Z. Twersky
Mitchell M. Z. Twersky
Jeffrey S. Abraham
Atara Hirsch
Matthew E. Guarnero
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-2050
Fax: (212) 279-3655
JAbraham@aftlaw.com
AHirsch@aftlaw.com
MTwersky@aftlaw.com
MGuarnero@aftlaw.com